Robert J. McKennon (SBN 123176) *rm@mckennonlawgroup.com*
Nicholas A. West (SBN 309003) *nw@mckennonlawgroup.com*
**MCKENNON LAW GROUP PC**
20321 SW Birch Street, Suite 200
Newport Beach, California 92660
Phone:  949-387-9595  |  Fax:  949-385-5165

Attorneys for Plaintiff Fabia Barsic

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

| | |
|---|---|
| FABIA BARSIC,<br><br>                    Plaintiff,<br><br>vs.<br><br>LINCOLN LIFE ASSURANCE COMPANY OF BOSTON; and DOES 1 through 10, inclusive,<br><br>                    Defendants. | Case No.:<br><br>Action Filed:<br><br>Trial Date:<br><br>**COMPLAINT FOR RECOVERY OF ERISA PLAN BENEFITS; ENFORCEMENT AND CLARIFICATION OF RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT INTEREST AND ATTORNEYS' FEES**<br><br>[Filed Concurrently With:<br>-   Civil Cover Sheet;<br>-   Summons; and<br>-   Certification of Interested Parties] |

Case No.:

**<u>INTRODUCTION</u>**

1.      Fabia Barsic ("Plaintiff") was a "Group Manager, Commercial Channel Marketing" for Epson America, Inc. ("Epson").  She spent long hours working at her desk on the computer.  When she was not sitting in front of her computer, she was usually traveling to meetings with clients and other Epson employees.  Over her many years of working for Epson, Plaintiff developed significant back and neck pain.  She suffers from degenerative disc disease at her C4-5 and C5-6 vertebrae.  She also suffers from moderate bilateral neural foraminal narrowing at her C5-6 vertebrae.  She endured subsequent pain in her neck, trapezius and shoulders for years.  Then, in early 2018, she developed debilitating headaches with vertigo and nausea, which caused her to seek medical help.  Her pain worsened significantly with radiating pain shooting down her right arm.  The pain grew such that even basic tasks such as bathing and brushing her hair were very painful, and she was no longer able to use a computer, mouse or keyboard per her doctor's instructions, at which time, her employer told her she could not return to work due to those restrictions.  Plaintiff eventually had to undergo cervical spine surgery to treat her condition.  However, whereas the surgery helped her, she still cannot consistently use her right hand or arm without pain.  She still suffers from excruciating pain in her right hand, shoulder and arm when she tries to use that hand for any length of time.  She continues to suffer levater scapula syndrome.  Her doctors have consistently explained that she has extensive restrictions and limitations that prevent her from working.  Through her work at Epson, Plaintiff is covered under a long-term disability ("LTD") policy (the "Policy") with Lincoln Life Assurance Company of Boston ("Lincoln").  Plaintiff filed a claim for LTD benefits under the Policy.  Lincoln approved the claim.  Lincoln started paying Plaintiff benefits under the Policy on August 8, 2018.  However, as documented in a letter dated May 9, 2020, Lincoln terminated Plaintiff's benefits.  Lincoln asserted that Plaintiff's use of her right hand was not restricted in any manner and that she could return to work.  It



1  reached this conclusion in part based upon a misunderstanding between Plaintiff's
2  treating physician and a doctor whom Lincoln hired to review Plaintiff's medical
3  records.  Plaintiff's treating physician mistakenly signed a letter that stated that
4  Plaintiff did not have restrictions and limitations affecting her right hand; he later
5  clarified that, in fact, Plaintiff clearly does have them.  In fact, the numerous
6  documents that the treating physician had already sent to Lincoln clearly stated that
7  Plaintiff suffered from that restriction to her ability to work.  Lincoln also
8  completely ignored her actual working conditions and how her position was usually
9  and customarily performed, things it was required to consider under the Policy.  Her
10 job required that she travel a significant portion of the time, approximately 50
11 percent.  Instead, Lincoln insisted that it should look to the national economy and a
12 different job's job requirements, to determine whether Plaintiff is disabled under the
13 Policy.  The Policy in no way ties her job to the national economy but rather defines
14 her own occupation as the substantial and material duties of her actual own
15 occupation as she performed them in the usual and customary manner.  Even after
16 Plaintiff appealed the denial of her claim and provided proof of ongoing support
17 from her treating physician, Lincoln insisted that Plaintiff could perform her own
18 occupation.  Because of that, she now comes before this Court, seeking to compel
19 Lincoln to pay her the benefits owed to her under the Policy.

## **JURISDICTION AND VENUE**

20
21         2.      Plaintiff brings this action to recover benefits and to enforce and clarify
22 her rights under Section 502(a)(1)(B) of the Employee Retirement Income Security
23 Act of 1974 ("ERISA"), 29 U.S.C. Section 1132(a)(1)(B).  This Court has subject-
24 matter jurisdiction over Plaintiff's claim pursuant to ERISA Section 502(e) and (f),
25 29 U.S.C. Section 1132(e) and (f), and 28 U.S.C. Section 1331.
26         3.      Venue lies in the Central District of California, Southern Division
27 pursuant to ERISA Section 502(e)(2), 29 U.S.C. Section 1132(e)(2), because
28

-2-



1  Plaintiff resides in this district, some of the alleged breaches occurred in this district
2  and the ERISA-governed plan at issue was administered in part in this district.

### THE PARTIES

4       4.      Plaintiff is an individual who, at all times relevant to this action, was a
5  citizen of the State of California and a resident of the City of Anaheim in Orange
6  County.  Further, at all times relevant to this action, Plaintiff was a participant, as
7  defined by ERISA Section 3(7), 29 U.S.C. Section 1002(7), in the employee welfare
8  benefit plan established by her former employer Epson (the "Plan"), which is at
9  issue in this action.

10      5.      Lincoln, at all times relevant, administered LTD benefits provided to
11 Plan participants, including Plaintiff, by issuing the Policy to Epson.  The Policy and
12 the Plan promised to pay LTD benefits to Plaintiff should she become disabled.

13      6.      The true names and capacities, whether individual, corporate, associate
14 or otherwise, of the defendants named herein as DOES 1 through 10, inclusive, are
15 unknown to Plaintiff at this time, who therefore sues DOES 1 through 10 by
16 fictitious names and will ask leave of the Court to amend this Complaint to show the
17 true names and capacities of DOES 1 through 10 when the same are ascertained;
18 DOES 1 through 10 are sued as principals and/or agents, servants, attorneys or
19 employees of said principals, and all of the acts performed by them were within the
20 course and scope of their authority and employment.  Plaintiff is informed and
21 believes and thereupon alleges that each of DOES 1 through 10 is legally
22 responsible in some manner for the events referred to herein, and directly and
23 proximately caused the damages and injuries to Plaintiff as hereinafter alleged.

### FACTUAL BACKGROUND

25      7.      Plaintiff worked as a "Group Manager, Commercial Channel
26 Marketing" for Epson.  Epson's "Job Profile" for the position explains that she was:

27

28

-3-



Responsible for the development, management, and execution of channel marketing strategies along with fully integrated commercial marketing efforts in support of channel partners. Helps in the planning and execution of channel specific advertising, outreach and training as well as championing individual reseller advertising on behalf of Epson. Considered to be the liaison and point person for channel partner needs. Also acts as the day to day contact with our outside creative support partners who work directly with resellers.

8.      The job description also lists the position's various physical requirements.  Among those requirements, it explains that Plaintiff must "frequently" "Use repetitive motions (of wrist, hands and/or fingers)."  It also states that she must carry and lift loads of up to 20 pounds and travel up to 50% of the time.  This travel could be local, national or international in nature.  The description does not say how often she must lift loads of up to 20 pounds.

9.      While working, Plaintiff injured her neck.  These injuries began gradually causing sore and stiff muscles in the neck, right shoulder and right trapezius areas.  She experienced pain on a semi-regular basis for roughly 8 years. This pain was associated with her work duties, especially the use of a computer with excessive keyboard and mouse usage.

10.     Whereas she suffered from this moderate and semi-regular pain for years, Plaintiff's condition worsened on or around March 8, 2018 when she developed debilitating headaches and vertigo.  The pain worsened and she started suffering from severe muscle spasms and radiating burning pain down through her right shoulder down her right arm and to her right hand.  She also started suffering from numbness and weakness in her right arm and right hand.  The symptoms in her right arm and hand worsened whenever she used a computer for any period of time and eventually it was not possible for her to work on a computer at all without excruciating pain.

Case No.:



11.     Plaintiff sought treatment for her condition.  What was once an annoying but tolerable condition had progressed such that she could no longer handle the pain of working.  A May 4, 2018 X-ray revealed moderate degenerative disc disease at her C5-6 vertebrae.  On May 25, 2018, she underwent an MRI.  The MRI revealed a C4 disc bulge and degenerative disc disease at the C4-5 and C5-6 vertebrae.  It further revealed moderate bilateral neural foraminal narrowing at her C5-6 vertebrae.

12.     In a June 20, 2018 Attending Physician's Report, Plaintiff's then-treating physician, Juan Escobar, M.D., acknowledged that Plaintiff could not work. He indicated that Plaintiff was temporarily totally disabled and that she suffered from "degenerative disc disease, cervical," "cervical pain" and "cervical radiculopathy."  He referred Plaintiff to a specialist for her condition.

13.     Through her work, Plaintiff acquired LTD coverage under the Policy. The Policy states in relevant part that:

> **"Disability"** or **"Disabled"** with respect to Long Term Disability, means:
>
> . . .
>
> a. if the Covered Person is eligible for the Maximum Own Occupation benefit, "Disability" or "Disabled" means during the Elimination Period and until the Covered Person reaches the end of the Maximum Benefit Period, as a result of an Injury or Sickness, he is unable to perform with reasonable continuity the Substantial and Material Acts necessary to pursue his Own Occupation in the usual and customary way.
>
> **"Own Occupation"** with respect to Long Term Disability, means the Covered Person's occupation that he was performing when his Disability or Partial Disability began.
>
> **"Substantial and Material Acts"** with respect to Long Term Disability, means acts that are normally required for the performance of the Covered Person's Own Occupation and cannot be reasonably omitted or modified.

Case No.:



14.     Plaintiff filed a claim for LTD benefits under the Policy.  In a letter dated September 25, 2018, Lincoln approved Plaintiff's claim for LTD benefits based largely on a paper review conducted by Behzad Emad, M.D.  In his report dated September 7, 2018, Dr. Emad explained that Plaintiff suffered from extensive restrictions and limitations to her ability to work, including:

> The claimant is restricted to sitting up to 4 hours at a time and up to a total of 8 hours in an eight hour day.
>
> The claimant is restricted to standing up to 2 hours at a time and up to a total of 4 hours in an eight hour day.
>
> The claimant should be allowed 5-minute breaks every 4 hours of sitting and 2 hours of standing and walking to stretch and change positions.
>
> The claimant is restricted to carrying, lifting, pushing and pulling no greater than 20 pounds of weight occasionally, and 10 pounds frequently.
>
> The claimant is restricted to occasional reaching overhead, above the shoulders, and below the waist level, and frequent reaching at waist/desk level using the right upper extremity.
>
> . . .
>
> The claimant is restricted to occasional reaching below the waist level using the left upper extremity.
>
> The claimant is restricted to occasional handling, fingering, feeling, grasping, pinching, gripping, and use of hand control using the right hand.
>
> . . .
>
> The claimant is restricted to occasional bending/stooping.
>
> The claimant is restricted from crawling, working at unprotected heights, driving commercial vehicle, climbing ladders, and operating heavy equipment or safety sensitive machinery.

15.     In his report, Dr. Emad provided a succinct summary of the Plaintiff's various test results:

Case No.:



The claimant has a history of neck pain that significantly worsened on 03/08/2018. She also started experiencing headaches and dizziness. On 05/03/2018, x-rays of the cervical spine showed moderate degenerative disc disease at C5-C6. An MRI of the cervical spine, dated 05/25/2018, revealed mild degenerative disc disease at C4-C5 and C5-C6; no significant central canal stenosis; and moderate bilateral neural foraminal narrowing at C5-C6. Analgesics, muscle relaxant, chiropractic care and physical therapy provided improvement, but not resolution of symptoms.

In recent visits, she complained of chronic right-sided neck pain radiating down the right upper extremity, with numbness, tingling and weakness. Exam noted slightly decreased cervical spine range of motion with pain; positive Spurling's and cervical facet maneuvers on the right; diffuse joint laxity throughout the body; decreased strength of the right upper extremity; decreased sensation on the right upper extremity in the median/C6 distribution; and slightly positive Neer's test with pain radiating into the cervical spine.

16.     Plaintiff was referred to an orthopedic specialist, Michael Danto, M.D. Plaintiff started to treat with Dr. Danto and Joshua Philips P.A.-C., another medical professional at Dr. Danto's office.  They started Plaintiff on a conservative treatment regime of physical therapy and epidural steroid injections.

17.     Plaintiff started attending physical therapy sessions on a regular basis. As Dr. Danto and Mr. Philips noted in a progress report dated September 10, 2018, Plaintiff responded well to the physical therapy.  Her headaches, dizziness, posture and range of motion all improved.  However, she still suffered from pain radiating into her scapula and deltoid along with numbness and tingling down her arm.  Her medical records further noted that she still required work restrictions of "no computer mouse or keyboard work" and that she could not lift more than 10 pounds.

18.     As part of her treatment, on October 23, 2018, Plaintiff provided Dr. Danto's office a description of her ongoing symptoms.  In it, she noted that she still suffered from sharp shooting pain in her neck down through her right arm.  Her symptoms were worsened by using a keyboard and mouse, driving a car and pushing

-7-

Case No.:



1    and pulling objects.  Her pain was constant but changed with varying levels of

2    activity.

3        19.    In a November 12, 2018 Primary Treating Physician's Progress Report,

4    Dr. Danto's office explained that "Over time, the patient's pain has appeared to

5    become more axial in nature and there is definitely degenerative disk disease with

6    some unstable retrolisthesis in a C4-5 and C5-6 level."  Mr. Philips scheduled a right

7    medial branch block.

8        20.    Plaintiff received a right C7-T1 epidural steroid injection and trigger-

9    point injections into her right cervical paraspinal muscles.  Unfortunately, these

10   injections failed to provide lasting relief.  As noted in a December 10, 2018 Progress

11   Report, Plaintiff still suffered from cervical spondylosis with kyphotic deformity,

12   C6 radiculopathy (improved), unstable C5-6 retrolisthesis with degenerative disk

13   disease and endplate changes and cervicogenic vertigo.  Conservative treatments

14   had failed to resolve her pain.

15       21.    As explained in medical records dated January 16, 2019, Plaintiff's

16   condition improved during the duration of the anesthetic for her medial branch

17   blocks.  Unfortunately, the benefits faded, and the pain returned when the anesthetic

18   wore off.  Given this result, Dr. Danto and Mr. Philips concluded that Plaintiff

19   would be a strong candidate for radiofrequency ablation of the right C4, C5 and C6

20   medial branches.  The prescribed restrictions and limitations of no computer work

21   and no lifting of greater than 10 pounds remained in effect.

22       22.    In a Progress Report dated February 27, 2019, Dr. Danto's office

23   reported on Plaintiff's ongoing condition after she underwent radiofrequency

24   ablation.  It stated in part that Plaintiff:

25

26       still gets the musculoskeletal pain in the right shoulder.  This pain is
         typically not present at rest other than a deep ache, but when she tries to
27       type or use the computer or do activities with her hands the pain
         becomes unbearable.  It feels like a 'spear' stabbing into her neck.  It is

28

-8-



much worse on the right than the left side.  The patient states that given the severity of the pain that comes on with activity, she does not feel like she can do her daily cooking, cleaning, and grooming and would not be able to work.

23.    Dr. Danto and Mr. Philips continued Plaintiff's restrictions and limitations.  They also noted that they wanted to prescribe another round of trigger-point injections considering Plaintiff's overall improvement.  However, if those failed, she would need spinal surgery if she was a suitable candidate.

24.    Plaintiff continued to receive physical therapy treatment on an ongoing basis.  The physical therapy did not resolve the problems with Plaintiff's right arm and hand.

25.    On April 4, 2019, Plaintiff visited Jeremy Smith, M.D. to determine whether she would be a candidate for a surgical resolution of her problems.  He recommended that Plaintiff undergo an anterior cervical discectomy and fusion from C4 to C7.  All previous conservative treatments had failed to restore proper sensation to her right arm.  She still suffered excruciating pain when she tried to use her right hand for any significant length of time.  Dr. Smith took five X-rays of Plaintiff's cervical spine and considered both the original X-rays and newer X-rays to reach his conclusion.  He noted:

> [M]ultilevel disk height loss.  There is focal kyphosis at the C4-5 level. There is significant disk height loss from C5 to C7.  There is anterolisthesis at C4-5 and C6-7.

> MRI scan of the cervical spine without contrast dated May 25, 2018, shows multilevel spondylosis.  There is an anterolisthesis at C4-5. There is central stenosis, most significant at C5-6 which is mild to moderate.  There is multilevel moderate to severe neural foraminal narrowing from C4 to C7.

Case No.:



26.     An April 10, 2019 Progress Report noted that Plaintiff's pain was now equally severe on both sides and that it was still interfering with her ability to function.  She had "almost no ability to use her right upper extremity for prolonged periods of time or with any fine motor activities."  She suffered from worsening neurological symptoms.

27.     On July 19, 2019, Plaintiff underwent a C4 to C7 anterior cervical fusion surgery.

28.     On August 1, 2019, Plaintiff had a post-op follow up examination with Dr. Smith.  In his report on that visit, Dr. Smith noted that Plaintiff "was having some minor difficulty with swallowing and some continued stiffness and soreness and especially radiating pain in her right upper extremity.  Other than that, though, [her] pain does appear to be improved since the time of surgery. . . ."

29.     On August 29, 2019, Plaintiff again treated with Dr. Smith.  His Progress Report from the visit noted that Plaintiff stated that "she is slowly improving in regard to her upper extremity pain, numbness, and tingling, though she still has some right greater than left upper trapezial pain."  Dr. Smith started Plaintiff on a physical therapy regimen of two sessions per week.

30.     On September 11, 2019, Dr. Smith completed a "Restrictions Form" for Lincoln.  In it, he noted that Plaintiff was temporarily totally disabled until her next appointment in October 2019.

31.     An October 10, 2019 Progress Report from Dr. Smith explained that Plaintiff "continues to be in physical therapy.  She is noticing much more range of motion to her left and a significant decrease in pain in her left side; however, she still has quite a bit of stiffness and soreness in her right shoulder and limited range of motion with turning to the right as well."  Dr. Smith further decided that Plaintiff could not work for another six weeks because "She is definitely not ready to return at this point."  He prescribed additional physical therapy.  On October 23, 2019, Dr. Smith completed an Attending Physician's Statement ("APS") for Lincoln.  In it, he

Case No.:



simply struck through the various check boxes on the form and wrote "N/A."  The form's contents were previously addressed by his narrative report.  Furthermore, Dr. Smith was preparing to transfer Plaintiff's care back to Dr. Danto's office.

32.     A January 23, 2020 Progress Report from Dr. Smith's office noted that Plaintiff had continued to receive trigger-point injections with Dr. Danto and Mr. Philips.  The pain had decreased from sharp pain of 6/10 to dull pain of 4/10.  She continued to have difficulty with lateral flexion bilaterally of her cervical spine.  She continued to suffer from "mild sensory deficits to the right C6 dermatome."  Dr. Smith recommended that Plaintiff continue to receive trigger-point injections and physical therapy.  He also transferred primary treating physician responsibilities back to Dr. Danto because Plaintiff had reached the maximum medical improvement possible from a surgical perspective.  Plaintiff was to remain off work unless Dr. Danto felt that she should return.

33.     A January 23, 2020 "Disability Status" report completed by Dr. Danto noted that Plaintiff continued to have restrictions and limitations: "no keyboard, computer, or mouse work."  Those tasks constituted most of the Plaintiff's work.  Plaintiff contacted Epson about performing her work with these restrictions and limitations, but Epson noted that it could not accommodate these work restrictions.  Plaintiff was still not capable of performing her "Own Occupation in the usual and customary way."

34.     On April 27, 2020, Plaintiff again treated with Mr. Philips and Dr. Danto.  Whereas it was noted that Plaintiff had experienced improvement of her condition, she continued to suffer from right-arm pain that at times could be debilitating.  She continued to have work restrictions of no lifting of weights greater than 10 pounds and no computer work with a keyboard and mouse.  Dr. Danto completed a Disability Status form wherein he noted that Plaintiff could not lift objects that weighed greater than 10 pounds and "no keyboard, computer, or mouse work."

Case No.:



35.     On May 4, 2020, Arlen Green, D.O. performed a review of Plaintiff's medical records for Lincoln.  In his assessment, he stated:

> [C]ervical disc disorder after sustaining a work-related injury on 03/08/18. Magnetic resonance imaging (MRI) of the cervical spine dated 05/25/18 reveals multilevel spondylosis. There is anterolisthesis C4-C5. There is central stenosis most significant at C5-6, which is mild to moderate. There is multilevel moderate to severe neural foraminal narrowing from C4-C7. Treatment included multiple physical therapy visits, oral medications, transcutaneous electrical nerve stimulation (TENS) unit, epidural steroid injections (ESI), radiofrequency ablation, and surgical intervention. She underwent a C4-C7 anterior cervical discectomy and fusion on 07 /19/19.

36.     After identifying the "primary impairing Diagnosis(es) with ICD 10 code(s)" as cervicalgia M54.2, cervical spondylosis M47.892, cervical anterolisthesis M43.12, cervical kyphosis M40.04, cervical radiculopathy M54.12, and status post cervical fusion Z98," he concluded that Plaintiff suffered from the following restrictions and limitations:

> Lifting, carrying, pushing and pulling 10 pounds occasionally (1/3 of the day) and 5 pounds frequently (1/3 to 2/3 of the day).
>
> Occasionally (1/3 of the day) reaching overhead. No restrictions with reaching at waist level or below.
>
> Occasionally (1/3 of the day) flexing, extending and rotating the neck.
>
> There are no restrictions with sitting, standing and walking. She has no restrictions with use of the lower extremities.
>
> Fingering, handling, feeling, and grasping are unrestricted.

37.     On same date, Dr. Green sent a letter to Dr. Danto.  In it, Dr. Green explained that he had examined Plaintiff's medical records and concluded that Plaintiff required the above listed restrictions and limitations.  Dr. Green stated that Plaintiff's ability to finger, handle, feel and grasp are unrestricted.  Neither in his

Case No.:



report nor in the letter did Dr. Green explain why he disagreed with those aspects of Dr. Danto's prescribed restrictions and limitations.  In the letter, Dr. Green asked Dr. Danto to sign and return the letter if he agreed with it.  Even though Dr. Danto had just explained that Plaintiff could not perform these tasks, he signed the letter and noted that he agreed with the restrictions without carefully reviewing the letter. As he later explained, Dr. Danto did not notice the statement stating "Fingering, handling, feeling, and grasping are unrestricted" in the letter and so inadvertently signed the letter.  Realizing his mistake, he later corrected this misunderstanding. He continues to support the diagnosis that Plaintiff cannot engage in unrestricted "Fingering, handling, feeling, and grasping."

38.    Dr. Danto had already submitted consistent and significant evidence to document that Plaintiff cannot use her right hand in a consistent manner.  Dr. Green ignored this evidence and only focused on evidence that favored Lincoln's position. This was in error.  Whereas an insurer and its agents may choose to place different weight on varying pieces of evidence, they may not choose to ignore evidence that does not support a given position.  *See Winkler v. Metro. Life Ins. Co.*, 170 F.App'x 167, 168 (2d Cir. 2006) (stating that an insurer "may, in exercising its discretion, weigh competing evidence, but it may not, as MetLife did here, cherry-pick the evidence it prefers while ignoring significant evidence to the contrary."); *Stuart v. CVS Corp.*, 2010 WL 890181, at *6, n. 3 (E.D. Mich. Mar. 10, 2010) (finding the administrator's decision to deny benefits to be arbitrary and capricious where the file-review physician's report indicated that the physician had "selectively cherry-pick[ed] the medical records to support his non-disability finding"); *Black v. Hartford Life Ins. Co.*, 2019 WL 2422481, *7 (D. Oregon, June 10, 2019) (awarding benefits and finding that the insurer abused its discretion because "Defendant has cherry-picked the evidence" by selectively noting "statements from the plaintiff's medical history that supported the decision to terminate her benefits, while ignoring evidence to support her disability").

Case No.:



39.     By a letter dated May 9, 2020, Lincoln terminated Plaintiff's LTD benefits in which it relied on Dr. Green's assessment of Plaintiff's condition, Dr. Danto's signature on the May 4, 2020 letter from Dr. Green and a highly flawed vocational analysis.

40.     As for the reliance on the letter to Dr. Danto, as will be explained below, Dr. Danto does not agree with this position, and Lincoln's reliance on the belief that he does agree was in error.

41.     Lincoln's vocational analysis erred in an important way: it looked to the national economy as opposed to how Plaintiff's individual job was performed. In particular, it relied on the Department of Labor's definition of various working conditions.  It concluded that Plaintiff's job only required occasional exertions of up to 10 pounds of force.  In fact, Plaintiff's job description states that she must exert 20 pounds of force to perform her job.  Furthermore, her job requires that she frequently travel and that, during those times, she must exert even more force to manage bags containing reports, computers and other work product.  Lincoln failed to even acknowledge this aspect of her job.  Lincoln's examination of how Plaintiff's job was performed in the national economy was in error because nothing in the Policy states that the generalized version of the job's duties is to be considered.  And, Lincoln's own doctor concluded that Plaintiff could not meet the strength requirements (20 pounds of force) required by her job as it is performed "in the usual and customary way."

42.     In an email dated May 17, 2020, Plaintiff informed Lincoln that she disagreed with the decision to terminate her benefits.  She emphasized how she still could not use a keyboard and mouse for any significant length of time.

43.     While working with Lincoln and receiving LTD benefits under the Policy, Plaintiff also received worker's compensation benefits.  On May 20, 2020, it was determined that she was permanently disabled and Plaintiff started to receive her permanent and stationary worker's compensation benefits.

Case No.:



44.     On May 31, 2020, Plaintiff appealed the termination of her benefits.  In her appeal letter, she included updated medical records.  She also explained that Lincoln had erred in denying her claim because Lincoln had misclassified her job duties.  Lincoln's insistence that she needed to only lift less than 10 pounds was incorrect.  She often had to travel for work and had to lift significantly heavier objects, at times up to 40 pounds.  She explained that she could not perform computer, keyboard, and mouse work and because of this her employer Epson did not allow her to return to her job and that has not changed since May 9, 2018.  She explained that her soreness and pain stem largely from muscle spasms that are aggravated by repetitive motions, carrying anything awkward or heavy.  She noted that she also suffers side effects from her pain medications, which make it difficult for her to work.  In particular, her medications make her drowsy and, due to her constant pain, she cannot sleep well enough to function during the day.

45.     On June 8, 2020, Dr. Danto's office issued another Disability Status form.  Once again, the office noted that Plaintiff could not perform any keyboard or mouse work and could not lift more than 10 pounds.  As documented in the related Progress Report, Dr. Danto and Mr. Philips decided to administer another trigger-point injection for the pain in Plaintiff's right arm.  They also explained that "We will continue her work restrictions of 10-pounds weightlifting with no keyboard, computer, or mouse work."

46.     In a letter to Lincoln dated September 29, 2020, Plaintiff explained that she was in the process of obtaining a letter from Dr. Danto's office to address the mistaken signing of the letter from Lincoln's paper reviewer, Dr. Green.  She explained that she mainly treated with Mr. Philips.  As such, it was easy for Dr. Danto to sign the letter from Dr. Green in error.  In her letter, she questioned Dr. Green ignoring of her various medical records and disability reports (which specifically stated that her ability to use her hands was limited) and Lincoln's

1  misclassification of her job duties.  She also submitted additional medical records

2  for Lincoln to consider.

3       47.    On October 13, 2020, Dr. Danto and Mr. Philips issued their "Primary

4  Treating Physician's Permanent and Stationary Report."  In the report, they noted

5  that Plaintiff "had a surgically treated disc lesion with residual, medically

6  documented pain and rigidity" and concluded that "The patient has reach[ed]

7  maximum medical improvement at this time."  In the report, they explained that:

> The patient failed conservative treatment of medication management,
> PT, and injection therapies with both local and interventional spine
> procedures. She had instability on flexion/extension x-rays and was
> sent for a surgical evaluation with Dr. Jeremy Smith. The patient
> underwent ACDF form C4-C7 with Dr. Jeremy Smith on July 19, 2019.
> The patient had significant improvement in many of her symptoms and
> had return of her strength. Unfortunately she has persistent pain that
> has interfered with her ability to return to work or use a computer.
>
> . . .
>
> The patient reports she can lift 5 pounds without much impairment and
> around 10 pounds at times but has significant pain and neck strain with
> anything heavier. She reports that daily activities such as doing the
> dishes and caring for her child are typically tolerable but lifting heavy
> objects such as groceries is not possible.
>
> Her biggest issue is she is still unable to use a computer for extended
> periods of times. She reports that when she sits and uses a computer she
> begins to experience debilitating pain after an hour. She will rest and
> then attempt to return to the computer after 1/2 an hour and can only
> work for another 15 minutes before the pain is debilitating. The patient
> states she can only use the computer for 2-3 hour[s] a day over an 8
> hour period and requires breaks. She reports she has tried different
> ergonomic setups without relief.
>
> . . .
>
> The patient's present x-rays of the cervical spine and flexion and
> extension obtained on 7/30/2018 showed the following: C3-4 and C4-5
> show slightly unstable anterolisthesis. There is slight loss of lordosis
> with a kyphotic deformity with apex at C5. There is unstable C5-6
> retrolisthesis with degenerative disk disease and significant endplate
> changes.

Case No.:



1

. . .

2

The patient's MRI of the cervical spine obtained on May 25, 2018,
shows the following: Reversal of anatomic lordosis. Mild degenerative
disk disease at C4-5 and C5-6 with no significant central canal stenosis.
Moderate bilateral neural foraminal narrowing at C5-6. MRI scan of the
cervical spine without contrast dated April 27, 2019, shows multilevel
disk degeneration, worst from C4 to C7. At C4-5, there is mild central
stenosis. At C5-6, there is moderate central stenosis and moderate to
severe bilateral neural foraminal stenosis. At C6-7, there is mild to
moderate central stenosis.

3
4
5
6
7

8

. . .

9

10

At this point in time, Ms[.] Barsic has reached a point of maximum
medical improvement and is permanent and stationary. We will place
her on the following permanent restrictions:

11

12

    Lifting, carrying, pushing and pulling 10 pounds occasionally
    (1/3 of the day) and 5 pounds frequently (1/3 to 2/3 of the day)

13

14

    Occasionally (1/3 of the day) reaching overhead. No restrictions
    with reaching at waist level or below.

15

16

    Occasionally (1/3 of the day) flexing, extending and rotating the
    neck

17

18

    One hour of continuous computer work at a time with breaks as
    needed for a total of 3 hours of computer work in an 8 hour work
    day

19

20

21

    48.    In a letter dated December 8, 2020, Dr. Danto addressed his signing of
the May letter from Dr. Green.  Dr. Danto explained:

22

23

Fabia Barsic has been treated in our clinic for a workers compensation
injury starting on 07/30/2018. She was made permanent and stationary
on 10/13/2020. On 5/7/2020 we responded to a request about
appropriate work restrictions. We erroneously omitted the following
restriction:

24

25

26

**No keyboard, computer or mouse work**

27

That restriction should have been in place on 5/7/2020 active until
10/13/2020 at which time it was changed to

28



**One hour of continuous computer work at a time with breaks as needed for a total of 3 hours of computer work in an 8 hour work day**

Her permanent restrictions as of 10/13/2020 are as follows:

Lifting, carrying, pushing and pulling 10 pounds occasionally (1/3 of the day) and 5 pounds frequently (1/3 to 2/3 of the day)

Occasionally (1/3 of the day) reaching overhead. No restrictions with reaching at waist level or below.

Occasionally (1/3 of the day) flexing, extending and rotating the neck. One hour of continuous computer work at a time with breaks as needed for a total of 3 hours of computer work in an 8 hour work day.

(Emphasis in original.)

49.    In a letter to Lincoln dated December 15, 2020, Plaintiff provided some clarification on her job duties and restrictions and limitations.  In it, she emphasized how travel was an important aspect of her job and she often had to carry bags weighing up to 30 pounds.  This would be in direct contradiction to the restrictions and limitations imposed by Dr. Danto's office.  She further explained that:

What the P&S report does NOT clarify, which I [am] clarifying to Lincoln Life Financial reviewers, is that the 3 - incontiguous 1 hour of computer use sessions I am limited to per day requires that I am **accommodated in a reclining position with both arms, head and neck supported so that there is almost no strain on my shoulders, trapezius and neck muscles.**

**a.** There is no such accommodation at the Epson office location. I would need to work from home permanently, or a recliner chair would need to be provided in my work cubicle.

**b.** Furthermore, I would not be able to work on my laptop while traveling except for reading and writing emails with voice recognition, since I would not have a recliner chair in my hotel room or visiting offices.

**c**. Thereby, my ability to find a new job in the future that is appropriate for my education and experience is even more improbable due to the accommodations required to perform those 3 hours of computer work, or due to a lesser amount of computer work which I could perform.  (Emphasis in original.)

-18-


50.     At Lincoln's request, on January 7, 2021, Michelle Alpert, M.D. reviewed Plaintiff's medical records.  Dr. Alpert noted that Plaintiff suffers from the following restrictions and limitations:

> The claimant can do lifting/carrying/pushing/pulling up to 20 pounds occasionally, and 10 pounds frequently. She should limit bending and twisting of her neck to occasional. She can reach at waist level and below the waist level frequently, but only occasionally above the shoulder level. She can walk frequently and stand frequently. She can sit up to 30 minutes at a time followed by a 5 minute period to re-position/shift position; this can be repeated throughout an 8 hour day.

> These restrictions and limitations should be supported on an ongoing basis given the chronic nature of her pain and degenerative spinal disease.

> The conditions are chronic and therefore her prognosis for her conditions having significant improvement is guarded. However, her prognosis for return to sustained physical capacity on a full time basis should be good if the above recommended limitations and restrictions are supported in the workplace.

> The claimant does not require restrictions/limitations for keyboarding/typing; she has intact strength and sensation in her hands. Her described difficulty with computer work is felt to be related to her cervicalgia and restrictions for this condition are outlined above, without further evidence to support additional restrictions on keyboarding/typing specifically. With proper posture, body mechanics, and the restrictions/limitations outlined, she should be able to do typing/keyboarding without specific restrictions or limitations from 5/8/20 to present and ongoing.

51.     Of import, Dr. Alpert noted, "However, her prognosis for return to sustained physical capacity on a full time basis should be good **if the above recommended limitations and restrictions are supported in the workplace.**" (Emphasis added.)  As Plaintiff explained in her letter dated December 15, 2020, no such accommodations are possible at Epson.  Furthermore, what matters is how the job is performed for Epson and not in the national economy.  As such, even Dr.

Case No.:



Alpert's restrictions and limitations, specifically regarding Plaintiff's bending and twisting of her neck and use of her hands, prevent her from performing her job in the usual and customary manner.

52.    Dr. Alpert's sole basis for asserting that Plaintiff can use her hands without restrictions were the strength and sensation in Plaintiff's hand.  Dr. Alpert specifically refused to heed Plaintiff's complaints of pain.  In essence, Dr. Alpert is demanding a specific form of evidence.  It does not matter that there is a difference between a one-time strength test and using a keyboard for eight hours in a workday. Dr. Alpert simply equates one with the other even though all of Plaintiff's treating physicians, the medical professionals to have actually examined her, have concluded otherwise.

53.    Here, Dr. Alpert even acknowledged that Plaintiff's pain was consistent with her objective findings.  She stated in his report:

> Yes. The severity and scope of the claimant's reported pain is consistent with cervical myofascial pain and can certainly fluctuate in severity from time to time. She was receiving trigger point injections which are the appropriate treatment for cervical myofascial pain.
>
> The fact that cervical myofascial pain and cervicalgia are her major limiting diagnoses is validated by the fact that she reported an increase in her symptoms after manual manipulation was stopped in PT, which primarily focused on soft tissue mobilization, improving tissue extensibility, and reducing soft tissue restriction.

54.    Dr. Alpert subsequently stated that:

> Given that the claimant has no neurologic deficits, has full strength and sensation on her examination as documented at her orthopedic follow up on 6/8/20, I do not agree with the stringent restrictions and limitations outlined by PA Phillips.
>
> She has cervical myofascial pain with no associated functional impairments, just self-reported discomfort. She was able to use her arms and legs fully; she just complained of pain with neck movement and keyboarding. She had surgery almost one year prior to 5/8/20 (beginning date under review) and would not have required such



Case No.:

1    stringent restrictions on her lifting nor on her ability to do computer
2    work.

3        55.    It is significant that Dr. Alpert never actually examined Plaintiff.
4    Indeed, the Ninth Circuit criticized such reliance on paper reviews over the opinions
5    of the treating physicians.  *See Montour v. Hartford Life & Accident Ins. Co.*, 588
6    F.3d 623, 634 (9th Cir. 2009) ("Another factor is Hartford's decision to conduct a
7    'pure paper' review in this case . . .").  An administrator may not "arbitrarily refuse
8    to credit a claimant's reliable evidence, including the opinions of treating
9    physicians."  *Michaels v. Equitable Life Assur. Soc.*, 305 F.App'x 896, 906-07 (3d
10   Cir. 2009) (questioning the administrator's choice to give determining weight to the
11   conclusions of experts' paper-review reports over the conclusions of claimant's
12   treating physicians); *Moskalski v. Bayer Corp.*, 2008 WL 2096892, at *9 (W.D. Pa.
13   2008) ("[T]he selective, self-serving use of medical information is evidence of
14   arbitrary and capricious conduct.").

15       56.    Courts have criticized claim administrators who deny claims by relying
16   on the paper-review reports of consultants who oppose the reasoned conclusions of
17   treating physicians.  *See, e.g.*, *Schwarzwaelder v. Merrill Lynch & Co., Inc.*, 606
18   F.Supp.2d. 546, 559 (W.D. Pa. 2009); *Elms v. Aetna Ins. Co. of Am.*, 2008 WL
19   4444269, at *15 (E.D. Pa. 2008) (It is "important to note that no doctor who has
20   actually treated [plaintiff] or examined her in person, as opposed to performing a
21   'file review[,]' has found her to be capable . . . of performing work-related tasks.");
22   *Winkler v. Metropolitan Life Ins. Co.*, 170 F.App'x 167 (2d Cir. 2006) (vacating the
23   denial as arbitrary where it was based "entirely on the opinions of three independent
24   consultants who never personally examined [plaintiff], while discounting the
25   opinions" of the treating physicians); *Glenn v. MetLife*, 461 F.3d 660, 671 (6th Cir.
26   2006), *aff'd b*y *Metropolitan Life Ins. Co.*, *supra*, 554 U.S. 105 (finding it
27   perplexing that the plan administrator disregarded the opinion of the "only physician
28   to have personally treated or observed" the claimant); *Kinser v. Plans Admin.*

-21-



*Comm. of Citigroup, Inc.*, 488 F.Supp.2d 1369, 1382-83 (M.D. Ga. 2007) (concluding that it was unreasonable for the plan administrator to ignore the treating physician's "clearly stated and supported opinion" and rely instead on "a cold record file-review by a non-examining" consultant); *Schramm v. CNA Fin. Corp. Insured Grp. Ben. Program,* 718 F.Supp.2d 1151, 1164 (N.D. Cal. 2010) ("The Court likewise gives little weight to the opinions of Drs. Marion and Fuchs. Although they reviewed plaintiff's medical records, they did not examine her in person.").

57.    Dr. Alpert even implicitly acknowledges that she does not know whether Plaintiff can use a computer for most of a day.  She specifically notes that Plaintiff "**should** be able to do typing/keyboarding without specific restrictions or limitations from 5/8/20 to present and ongoing."  (Emphasis added.)  Dr. Alpert simply does not know.  She also did not address the side-effects of her medications except to say there were no reported side-effects.  But this was not true as Plaintiff made it clear in her appeal that she suffers significant medication side-effects.  It appears that Lincoln did not make her appeal letter available to Dr. Alpert thus he did not have the benefit of her important factual statements about how the medication side-effects significantly affected her.

58.    In a letter dated March 11, 2021 (the "Denial of Appeal"), Lincoln denied Plaintiff's appeal of the termination of her LTD benefits.  The Denial of Appeal largely repeated Dr. Alpert's position.  In this letter, Lincoln stated:

> The appeal review concludes that the medical evidence does support ongoing restrictions and limitations of lifting/carrying/pushing/pulling up to 20 pounds occasionally, and 10 pounds frequently, limited bending and twisting of the neck, reaching at waist level and below the waist level frequently, occasionally reaching above the shoulder level, walking and standing frequently, and sitting up to 30 minutes at a time followed by a 5-minute period to re-position/shift position throughout an 8-hour day; however[,] these would not preclude you from the duties of your own occupation as identified in the Occupational Analysis. Additionally, driving and traveling to and from work are not considered a substantial and material act of your own occupation. The occupational



analysis also does not identify traveling as a substantial and material act. As such, you are not Disabled from your own occupation as defined by the Policy.

59.     In addition to repeating Dr. Alpert's significant errors, Lincoln also committed another error that renders its decision completely incorrect: Lincoln insisted that it should look to the national economy to determine how Plaintiff's job should be performed.  The Denial of Appeal emphasized the Dictionary of Occupational Titles from the Department of Labor's version of Plaintiff's job duties in concluding that she could work.  It completely ignored the reality of her actual job that included travel and lifting in excess of 20 pounds, especially lifting this weight while traveling.  Dr. Alpert did not address her travel duties or her requirements for lifting more than 20 pounds.  Where a paper reviewer failed to consider the claimant's job duties in conjunction with her medical conditions, courts will reject a paper reviewer's opinions as unhelpful.  *See Elam v. Anthem Life Insurance Co.*, 2021 WL 4061701, at *10 (N.D. Cal. Sept. 7, 2021).

60.     The Policy merely states that Lincoln should look to how the job is performed in the usual and customary manner.  It in no way referenced the national economy.  Lincoln merely chose to read this into the Policy so that it could freely deny the claim and save itself from having to pay Plaintiff disability benefits under the Policy because even its paper review doctors are all in agreement that Plaintiff is incapable of satisfying the lifting requirements of her job as it was actually performed at Epson.

61.     The Denial of Appeal also explained that:

At this time, your administrative right to review is exhausted; no further review will be conducted by Liberty and your claim will remain closed. You may request to receive, free of charge, copies of all documents relevant to your claim. You have the right to bring a civil action under section 502(a) of ERISA following an adverse benefit determination on review.

-23-



1

**FIRST CLAIM FOR RELIEF**

To Recover Benefits, Attorneys' Fees, Pre-Judgment and Post-Judgment Interest

under an ERISA Plan – 29 U.S.C. Sections 1132(a)(1)(B), (g)(1)

(Plaintiff against Lincoln and Does 1 through 10)

62.    Plaintiff incorporates the previous paragraphs as though fully set forth herein.

63.    ERISA Section 502(a)(1)(B), 29 U.S.C. Section 1132(a)(1)(B), permits a plan participant to bring a civil action to recover benefits due to her under the terms of a plan, to enforce her rights under the terms of a plan and/or to clarify her rights to future benefits under the terms of a plan.

64.    At all times relevant, Plaintiff has been entitled to LTD benefits under the Plan.  By denying Plaintiff's claim for LTD benefits under the Plan, and by related acts and omissions, Lincoln violated, and continues to violate, the terms of the Plan, and Plaintiff's rights thereunder.

65.    Lincoln has failed to follow even the most rudimentary claims processing requirements of ERISA and the Department of Labor Regulations and has failed to conduct a "full and fair review" of the claim denial, an action required by 29 U.S.C. Section 1133(2).  Thus, even if the Plan vests discretion in Lincoln to make benefit determinations, no deference is warranted with regard to Lincoln's handling of this claim.  *See Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1465 (9th Cir. 1997); *Jebian v. Hewlett-Packard Company Employee Benefits Organization Income Protection Plan*, 349 F.3d 1098, 1105 (9th Cir. 2003) ("When decisions are not in compliance with regulatory and plan procedures, deference may not be warranted.").

66.    A "prudent person" standard is imposed on ERISA fiduciaries.  *See* 29 U.S.C. §1104(a)(1)(b).  A "fiduciary" is also under a duty of loyalty and care to the beneficiaries of a plan.  *See* 29 U.S.C. Section 1104(a)(1).  Under ERISA: (1) a fiduciary must fulfill its duties solely in the interest of plan participants and



1  beneficiaries and for the exclusive purpose of providing plan benefits to them; (2) a

2  fiduciary must act with care, skill, prudence and diligence; and (3) a fiduciary may

3  not act in any capacity involving the plan, on behalf of a party whose interests are

4  adverse to the interests of the plan, its participants or its beneficiaries.  Lincoln's

5  handling of Plaintiff's disability benefit claim falls far short of these standards.

6        67.    For all of the reasons set forth above, Lincoln's decision to deny

7  disability insurance benefits to Plaintiff was arbitrary, capricious, wrongful,

8  unreasonable, irrational, contrary to the evidence, contrary to the terms of the Plan

9  and contrary to law.  Lincoln abused its discretion in deciding to deny this claim,

10  because the evidence shows that its denial decision was arbitrary and capricious.

11  Further, Lincoln's denial decision and related actions heighten the level of

12  skepticism with which a court views a conflicted administrator's decision under

13  *Abatie v. Alta Health & Life Insurance Co.*, 458 F.3d 955 (9th Cir. 2006) and

14  *Metropolitan Life Insurance Co. v. Glenn*, 544 U.S. 105 (2008).  Lincoln's denial of

15  Plaintiff's claim constitutes an abuse of discretion.

16        68.    As a direct and proximate result of Lincoln's denial of disability

17  benefits, Plaintiff has been deprived of LTD benefits from May 8, 2020 to the

18  present.

19        69.    As a direct and proximate result of the denial of her claim for LTD

20  benefits, Plaintiff has been required to incur attorneys' fees to pursue this action,

21  and is entitled to reimbursement of these fees pursuant to 29 U.S.C. Section

22  1132(g)(1).

23        70.    A controversy now exists between the parties as to whether Plaintiff is

24  disabled as defined in the Plan and therefore entitled to LTD benefits.  Plaintiff

25  seeks the declaration of this Court that she meets the Plan definition of "disability"

26  and is entitled to benefits under the Plan.  In the alternative, Plaintiff seeks a remand

27  to the claims administrator for a determination of Plaintiff's claim that is consistent

28  with the terms of the Plan.

Case No.:





71.     Plaintiff alleges all of the same conduct against Does 1 through 10 as she does against Lincoln in this First Claim for Relief and in this Complaint.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays that this Court grant the following relief against all Defendants:

1.     For all Plan benefits due and owing Plaintiff, including LTD benefits.

2.     For costs and reasonable attorneys' fees pursuant to 29 U.S.C. Section 1132(g).

3.     For pre-judgment and post-judgment interest on the principal sum, accruing from the date on which the obligations were incurred. *See Blankenship v. Liberty Life Assurance Co. of Boston*, 486 F.3d 620, 627 (9th Cir. 2007) ("A district court may award prejudgment interest on an award of ERISA benefits at its discretion."); *Drennan v. General Motors Corp.*, 977 F.2d 246, 253 (6th Cir. 1992). Specifically, Plaintiff seeks interest at the rate of 10% per annum, pursuant to California Insurance Code Section 10111.2.

4.     For such other and further relief as this Court deems just and proper.

Dated:  December 15, 2021                **McKENNON LAW GROUP PC**

By: _____
ROBERT J. McKENNON
NICHOLAS A. WEST
Attorneys for Plaintiff, Fabia Barsic

Case No.: